Russell KUNTZ, Administrator of the Estate of Christine Ann Kuntz, Deceased, Plaintiff,

v.

WINDJAMMER "BAREFOOT" CRUISES, LTD., a corporation, and Abagados Panamaneos Incorporados, a corporation, and English Harbor Yachts, Ltd., a corporation and, Fantome, Ltd., a corporation, and Tom Miller, Defendants.

Civ. A. No. 79–537.

United States District Court, W.D. Pennsylvania.

Aug. 16, 1983.

Edward J. Balzarini, Jr., Pittsburgh, Pa., for plaintiff.

James B. Cole, Pittsburgh, Pa., for Windjammer "Barefoot" Cruises, Ltd.

Arthur J. Leonard, Pittsburgh, Pa., for English Harbor Yachts.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

ZIEGLER, District Judge.

### I. *History of Case*

(1) This is a civil action for money damages filed by Russell Kuntz, as Administrator of the Estate of Christine Ann Kuntz, against Windjammer "Barefoot" Cruises, Ltd., and English Harbor Yachts, Ltd. The action was instituted in the Court of Common Pleas of Allegheny County, Pennsylvania, on March 14, 1979, and removed to this court pursuant to 28 U.S.C. § 1441 by defendant Windjammer Cruises on April 23, 1979.

(2) Russell Kuntz is a citizen of the Commonwealth of Pennsylvania. Windjammer Cruises, Ltd. is a corporation organized and existing under the laws of the British Virgin Islands. Windjammer is registered to do business in the State of Florida. Defendant English Harbor Yachts, Ltd. is a corporation organized and existing under the laws of the British Virgin Islands. The amount involved exceeds the sum of $10,-000. Jurisdiction of this court is premised on diversity of citizenship, 28 U.S.C. § 1332, and in admiralty, based on 46 U.S.C. § 761, which is the Death on the High Seas Act.

(3) The original complaint sought money damages for the alleged wrongful and negligent acts of Windjammer Cruises, Ltd. and Tom Miller, its alleged employee, based on the Wrongful Death and Survival Acts of the Commonwealth of Pennsylvania, 42 Pa.C.S.A. §§ 8301 and 8302. The complaint also contained a claim against a third defendant, Abagados Panamaneos Incorporados, but that claim has not been pursued, will be dismissed by the court, and is not relevant to these findings.

(4) On May 9, 1979, the administrator filed an amended complaint in this court seeking money damages against the defendants of record, at that time, based on the Death on the High Seas by Wrongful Act statute, 46 U.S.C. § 761, hereafter referred to as DOHSA.

(5) Windjammer Cruises then filed a motion to dismiss the original and amended complaints, alleging want of personal jurisdiction, forum non conveniens, and preemption by DOHSA. The parties initiated discovery concerning the jurisdiction questions, and, on August 24, 1979, this court denied the motion by holding that jurisdiction is extant under DOHSA, and further that this court had personal jurisdiction by virtue of Windjammer's aggregate, substantial, and continuous business contacts with the United States and this forum.

(6) On December 15, 1980, plaintiff filed a motion to add English Harbor Yachts, Ltd., and Fantome, Ltd., as defendants. The motion was granted the next day. The amended complaint which followed posited jurisdiction based upon diversity of citizenship and DOHSA. The amended complaint contained damage claims under DOHSA and the Pennsylvania Wrongful Death and Survival Acts. Windjammer Cruises responded with a motion to dismiss the money damage claim, grounded on the state statutes, due to the alleged pre-emption by DOHSA with respect to the damages. The added defendants also moved to dismiss, asserting that the claim was time-barred, because the complaint was not filed as to them until February 18, 1981, whereas DOHSA required that an action be institut-

ed within two years of the operative event at that time.

(7) In a memorandum dated November 6, 1981, this court held that plaintiff's claim, based on DOHSA, was untimely as to English Harbor Yachts, Ltd., and Fantome, Ltd., but timely as to them under the Fatal Accidents Act of the Bahamas, as provided by 46 U.S.C. § 764.

(8) On May 12, 1980, defendant Tom Miller moved to dismiss, alleging want of personal jurisdiction. Following discovery relative to this issue, we ordered that the action against Miller be transferred to the United States District Court for the Southern District of Texas, pursuant to 28 U.S.C. § 1404(a). The date of that order was October 12, 1982. The memorandum explaining this court's reasoning is dated September 27, 1982, and filed of record.

(9) The case then proceeded to a bench trial against defendants Windjammer "Barefoot" Cruises, Ltd., and English Harbor Yachts, Ltd. Plaintiff's claims against Abagados Panamaneos Incorporados and Fantome, Ltd., are no longer being pursued and this court will enter an order dismissing those parties from the case. Plaintiff's claim for damages against English Harbor Yachts, Ltd., is grounded on the Fatal Accidents Act of the Bahamas. The foregoing findings rehearse the procedural posture of this case in order to facilitate appellate review, if any. We turn now to the questions of subject matter jurisdiction and choice of law.

## II. Jurisdiction and Choice of Law

■ (10) The first question we must resolve is whether we have subject matter jurisdiction in admiralty, pursuant to 28 U.S.C. § 1333, since this is a civil action arising out of a scuba diving accident. We hold that subject matter jurisdiction is extant in accordance with the teachings of *Foremost Insurance Company v. Richardson,* 457 U.S. 668, 102 S.Ct. 2654, 73 L.Ed.2d 300 (1982). There the Supreme Court held that the federal interest in protecting maritime commerce can be vindicated only if all operators of vessels on navigable waters, whether commercial or other-

wise, are subject to uniform rules. Here, we have a commercial vessel in navigable waters, providing a maritime service to passengers for a fee, with the service promoted, conducted, and supervised by a member of the crew. In addition, as Justice Stewart points out in *Executive Jet Aviation v. City of Cleveland,* an aviation case, the Death on the High Seas Act provides a basis for our jurisdiction, so long as there is a nexus with traditional maritime activity and, as here, a vessel on the high seas is involved. 409 U.S. 249, 93 S.Ct. 493, 34 L.Ed.2d 454 (1972). We hold that subject matter jurisdiction in admiralty is present. See *Benedict On Admiralty,* Volume 2, Section 2, pages 1 through 16.

■ (11) The next question we must resolve concerns the substantive law which applies to this case, because the original jurisdiction of this court is based on diversity of citizenship, 28 U.S.C. § 1332, and federal question jurisdiction, predicated on DOHSA, 46 U.S.C. § 761. In the former, the substantive law of Pennsylvania is controlling. In the latter, federal admiralty law is controlling. We hold that federal admiralty law controls the substantive law of this case, because the accident occurred on the high seas and more than one marine league beyond the United States and its territories. In our judgment and we find, Congress sought uniformity when it enacted DOHSA, rather than the possibility of disparate and inconsistent results that could follow a death on the high seas, if the federal district courts were required to apply the substantive law of the various states. In short, DOHSA and federal maritime law pre-empts the substantive law of Pennsylvania and, therefore, is controlling.

■ (12) We also find that the substantive maritime laws of the United States, including DOHSA, control the outcome in this case, despite the fact that the accident occurred on the seas near the Bahamas. Windjammer does not contend otherwise. Indeed, Windjammer urged this choice of law from the outset, and the case has been tried by the parties on that basis. In *Chi-*

*rinos de Alvarez v. Creole Petroleum Corporation*, 613 F.2d 1240 (3d Cir.1980), the Court of Appeals articulated the factors to be considered in ascertaining whether the laws of the United States should apply to accidents without the United States. Although that case dealt with an injury to a seaman in a foreign country, the rationale is applicable to this case. In the instant case, the plaintiff and the deceased are United States citizens. The contract for the voyage was executed in the United States. The defendants do substantial business in the United States and Pennsylvania. Indeed, Windjammer advertises extensively in Pennsylvania newspapers and national publications throughout this nation. All witnesses in this case are citizens of the United States. Windjammer is registered to do business in the state of Florida and does business in other states and maintains an office in Miami and pays taxes to the state of Florida. The only contrary factors are that the accident occurred in the Bahamas, and defendants are foreign corporations. However, in our judgment, these factors do not prevent the application of the laws of the United States, pursuant to the teachings of *Creole Petroleum Corporation*. In short, we find that federal substantive law controls the claim against Windjammer and English Harbor Yachts and that Windjammer has urged this court to so hold from the outset. Windjammer's urgings are consistent with the law in the Third Circuit.

### III. *Facts*

(13) Christine Ann Kuntz was born on September 30, 1957, and died on April 14, 1978, while scuba diving off Little Stirrup Bay, Berry Islands, Bahamas. The cause of death was drowning. Prior to her death, Miss Kuntz was a passenger on the vessel Fantome, which is owned and operated by defendants.

(14) Christine Kuntz read an advertisement in Cosmopolitan Magazine in October, 1977. See Plaintiff's Exhibit 11A. Thereafter, she attended a film at the Marriott Hotel in Pittsburgh which was presented to attract customers to Windjammer's "Barefoot" Cruises. See Exhibits 9 and 10. Plaintiff's Exhibit No. 2 is an invoice from Windjammer Cruises, through its representative at Northway Mall, Pittsburgh, indicating that payment had been made by decedent and two others for a cruise from April 10 through April 16, 1978. The decedent flew to Miami, Florida, and then to Freeport, Bahamas, where she boarded the Fantome.

(15) Christine Kuntz was capable of swimming, but had no prior experience as a scuba diver. She paid a fee and agreed to receive scuba diving instructions under the direction of Tom Miller. Miller was a certified scuba diver and instructor and, as defendants have stipulated, he was their agent, servant, and employee at the time of the accident.

(16) The decedent enrolled in the resort course, which is a program devised by the National Association of Underwater Instruction. The resort course is designed to introduce the novice to the rudiments of scuba diving. The minimum standards pertaining to the course are set forth in Plaintiff's Exhibit Nos. 18 and 19, and we find that the standards were in effect and applicable to the instant cause of action. Tom Miller was a member of the Association at the time of the accident.

(17) The decedent attended a lecture and participated in a shallow water dive, under the supervision and direction of Tom Miller, prior to her death. On April 14, 1978, she participated in an open water, deep dive, under the direction of defendants' employee, Mr. Miller.

(18) We find that Christine Kuntz's death was caused by the "wrongful act, neglect, or default" of defendants, which occurred on the high seas and beyond one marine league from the shore of any state, territory, or dependency of the United States, as defined in 46 U.S.C. § 761.

(19) We find that plaintiff has established by a preponderance of the evidence that the open water dive on April 14, 1978, was negligently conducted, wrongfully su-

pervised, and deficiently handled by Tom Miller, in the following particulars:

A. In failing to institute and maintain a buddy or partner type system when the four inexperienced students entered the open water off the reef adjacent to Little Stirrup Bay;

B. In failing to institute a partner system and in failing to assign a partner or buddy to the decedent;

C. In failing to direct and supervise the activities of the class during the deep dive;

D. In failing to remain present and supervise the decedent after she encountered difficulty with her mask and in equalizing during the dive;

E. In engaging in spear fishing and leaving the area of the students, when Tom Miller knew or should have known that Christine Kuntz was a problem student and having difficulty;

F. In failing to instruct Christine Kuntz to leave the reef and in failing to guide the decedent to shallow water, once Mr. Miller knew or should have known that she was encountering difficulty with her mask and equalizing during the dive;

G. In failing to insure that the students, including Miss Kuntz, remained in the immediate area of Tom Miller at all times;

H. In failing to give close, direct, personal attention to the class, and the decedent in particular;

I. In failing to establish a surface support station for the open water dive; and

J. In failing to give close, direct, personal attention to the decedent, when she encountered difficulty, and in failing to institute and maintain a buddy or partner system, when Miss Kuntz encountered difficulty for the second time.

(20) We find that Russell Kuntz, administrator, has established by a preponderance of the evidence that the negligence of Tom Miller was the proximate or legal cause of the death of Christine Kuntz. Stated another way, the plaintiff has established by a preponderance of the evidence that the negligence of Tom Miller was a substantial contributing factor in the death of Miss Kuntz. In this regard, we find by a preponderance of the evidence that, if Tom Miller had instituted and maintained a partner system during the deep dive, as required by the practice and standards of the scuba diving instructors and the Association, or maintained proper supervision of decedent and the students, or instituted a surface support station, or remained in the vicinity of the students and the decedent, this mishap would not have occurred.

■ (21) We find by a preponderance of the evidence that Tom Miller was negligent, as that term is used in 46 U.S.C. § 761, and that such negligence was the proximate cause of the death of Christine Kuntz. As rehearsed, Windjammer Cruises and English Harbor Yachts have stipulated that Mr. Miller was an agent, servant, and employee at the time of the accident.

(22) We turn now to the question of whether Christine Kuntz was contributorily negligent, as that term is defined in DOHSA at 46 U.S.C. § 766. Congress has provided that, "In suits under this chapter, the fact that the decedent has been guilty of contributory negligence shall not bar recovery, but the court shall take into consideration the degree of negligence attributable to the decedent and reduce the recovery accordingly." Here, the defendants bear the burden of proof by a preponderance of the evidence.

■ (23) We find that defendants have established by a preponderance of the evidence, that Christine Kuntz was negligent and that her negligence was a substantial contributing factor in her death. We find persuasive and credible in this regard the testimony of D. David Dolesal. He testified, and we find as a fact that Christine Kuntz participated, with others, in smoking two to three marijuana cigarettes between 7:00 to 9:00 p.m., on April 13, 1978; drinking alcoholic beverages to the degree that she had to be assisted to her cabin; that she had consumed, prior thereto, at least one amphetamine capsule; and that she was intoxicated at approximately 12:00 a.m.

on the night prior to the dive off Little Stirrup Bay.

(24) The testimony of this credible witness, we find, establishes the foregoing finding by a preponderance of the evidence and provides the factual predicate for the opinion of Dr. Stanley Geyer. He testified that the ingestion of alcohol and the use of marijuana, in the amount discussed, on the evening prior to the dive, was a substantial contributing factor in her death, because these chemicals depress the central nervous system and affect coordination and motor function. We find by a preponderance of the evidence that Christine Kuntz's motor functions were diminished and thereby affected her ability to respond and survive in this hostile, underwater environment. In short, we find that defendants have established by a preponderance of the evidence that Christine Kuntz was contributorily negligent and that such negligence was a substantial contributing factor in her death.

■ (25) We turn to the question of the degree or percentage of the causative negligence of Christine Kuntz. We find that degree or percentage of her fault to be 50 percent, by a preponderance of the evidence. Our finding is based on the fact and we find that, even with the factor of diminished coordination, Christine Kuntz would have survived if Tom Miller had established or maintained a buddy system or properly supervised the students and Miss Kuntz as required. Thus, we reject defendants' argument that the decedent's negligence was the sole cause of her death or a superseding and intervening cause under the circumstances. Her conduct was not so extraordinary as not to be reasonably foreseeable.

To repeat, we find, by a preponderance of the evidence, that Miss Kuntz contributed to her own death in the percentage of fifty, but, had defendants' agent and servant properly supervised the students and Miss Kuntz, who were novice divers, this incident would not have occurred.

On the other hand, we find that, had Miss Kuntz not ingested the chemicals which produced the diminished motor capacity, she may have been able to better respond to the unsupervised conditions that confronted her due to the negligence of Tom Miller.

In short, we find that the negligence of Miller and the decedent were substantial contributing factors in the death, and we find, by a preponderance of the evidence, that defendants have established the contributory negligence of Miss Kuntz to be 50 percent.

## IV. Liability of Windjammer For Damages

(26) We turn to the question of damages against defendant Windjammer "Barefoot" Cruises, Ltd. Here, plaintiff contends that he is entitled to recover damages, based on DOHSA, 46 U.S.C. § 761, which requires a showing of dependency, and also damages based on the Pennsylvania Survival Act, 42 Pa.C.S.A. 8402. Plaintiff relies on *Dugas v. National Aircraft Corporation*, 438 F.2d 1386 (3d Cir.1971).

(27) DOHSA provides that "The personal representative of the decedent may maintain a suit for damages in the District Courts of the United States, in admiralty, for the exclusive benefit of the decedent's wife, husband, parent, child, or dependent relative, against the vessel, person, or corporation which would have been liable, if death had not ensued." 46 U.S.C. § 761.

■ (28) Windjammer rejoins that, if plaintiff is entitled to recover money damages, recovery is limited to the damages recoverable under DOHSA; namely, the actual pecuniary loss sustained by the beneficiaries due to the wrongful death. Windjammer argues that *Dugas v. National Aircraft Corporation* has been impliedly reversed by the Supreme Court's decision in *Mobil Oil Corporation v. Higginbotham*, 436 U.S. 618, 98 S.Ct. 2010, 56 L.Ed.2d 581 (1978). We disagree. *Higginbotham* established that, in an action for wrongful death on the high seas, the measure of damages is governed by the Death on the High Seas Act. There is no discussion concerning survival actions under ei-

ther a state law or federal maritime law. There is no discussion or citation to *Dugas*. Therefore, we hold that *Higginbotham* is limited to wrongful death actions following a death on the high seas, and *Dugas* remains the law of the Circuit.

(29) There is a separate basis for our conclusion that an administrator is not barred from pursuing a survival action, as well as a wrongful death action, following a death on the high seas.

(30) The starting point for our analysis is the decision of *Moragne v. States Marine Lines, Inc.*, 398 U.S. 375, 90 S.Ct. 1772, 26 L.Ed.2d 339 (1970). *Moragne* establishes that a cause of action exists under general maritime law for death caused by violation of maritime duties. *Moragne* overruled *The Harrisburg*, 119 U.S. 199, 7 S.Ct. 140, 30 L.Ed. 358 (1886) which had held that general maritime law does not afford a cause of action for wrongful death, in the absence of a federal or state statute granting such relief. Consequently, during the post *Harrisburg* era, federal admiralty courts routinely applied state wrongful death statutes to provide relief. *Moragne* therefore discarded such an approach. The application of maritime law in general, as opposed to a particular state statute, is evidenced by the Supreme Court's review of English common law, federal statutes, and all the relevant state statutes in *Moragne*. *Id.* 398 U.S. at 381–383 and 390, 90 S.Ct. at 1777–1779 and 1782. Additionally, the Court's subsequent decision in *Sealand Services, Inc. v. Gaudet*, 414 U.S. 573, 94 S.Ct. 806, 39 L.Ed.2d 9 (1974), entailed a general discussion of wrongful death statutes as compared to specific state statutes. *Id.* at 575–583, n. 2 and 5–9, 94 S.Ct. at 810–814. Thus, at least one court and commentator have interpreted *Moragne* and *Gaudet* as precluding the application of the statute of a particular state, as opposed to applying general maritime law. See *Matter of S/S Helena*, 529 F.2d 744 (5th Cir.1976); Benedict on Admiralty, Volume 2, Supplement at page 69. Finally, neither *Moragne* nor *Gaudet* hold that a survival action does not exist under general maritime law.

(31) Although *Dugas* was decided after *Moragne, Dugas* neither acknowledged nor addressed the rationale of *Moragne;* namely, that general maritime law provides the remedy rather than the specific state statute. Indeed, one commentator has viewed *Dugas* as a pre-*Moragne* decision, since it applied a specific state survival statute, thus ignoring general maritime law. See *Smith*, A Maritime Survival Rededy: Is There Life After Higginbotham, 6 Maritime Lawyer 185 (1981).

■ (32) At this juncture, we must determine whether maritime law recognizes a survival action. We find the clear weight of authority teaches that survival actions are well-founded under general maritime law. *See, e.g., Barbe v. Drummond*, 507 F.2d 794, 799 (1st Cir.1974); *Spiller v. Thomas M. Lowe and Associates, Inc.*, 466 F.2d 903, 909 (8th Cir.1972); *Greene v. Vantage Steamship Corporation*, 466 F.2d 159, 165–167 (4th Cir.1972); *Dennis v. Central Gulf Steamship Corporation*, 453 F.2d 137, 140, 141 (5th Cir.1972).

■ (33) Defendants assert that DOHSA is the exclusive remedy for deaths occurring on the high seas, thereby precluding a general maritime claim for either a wrongful death or survival action. Defendants cite *Mobil Oil Corporation v. Higginbotham*, 436 U.S. 618, 98 S.Ct. 2010, 56 L.Ed.2d 581 (1978). There, the plaintiffs sought to recover damages for loss of society predicated upon a wrongful death claim under general maritime law. The Supreme Court held that Congress spoke directly to the issue of damages for loss of society when it limited recovery to pecuniary loss under DOHSA. Accordingly, DOHSA preempted recovery for damages for loss of society, based upon a general maritime law claim. The issue turns, therefore, on whether Congress spoke directly to the issue of a survival action within the parameters of DOHSA. We find that Congress did not.

(34) First, it must be emphasized that a wrongful death action and a survival action are two distinct claims for relief in death

cases. A wrongful death action permits beneficiaries of a decedent to recover for their losses resulting from the death. A survival action is brought on behalf of the decedent's estate for any claims the decedent would have had but for the death. American courts have painstakingly distinguished the two causes of action for many years. A case in point is *Gaudet*, 414 U.S. at page 575, n. 2, 94 S.Ct. at page 810, n. 2.

(35) The legislative history of DOHSA is also relevant. It is clear that Congress understood the distinction between the two types of actions and did not excuse survival actions under DOHSA. Representative Volstead, who sponsored the bill, stated as the purpose of the bill as follows:

> The object of this bill is to give a cause of action in case of death resulting from negligence or wrongful act occurring on the high seas. Nearly all countries have modified the old rule which did not allow relief in the case of death under such circumstances. Under what is known as Lord Campbell's Act, England, many years ago, authorized recovery in such cases. France, Germany, and other European countries now followed this more humane and enlightened policy and allow dependent parties to recover in case of death of their near relatives upon the high seas.

Congressional Record, 66th Congress, Volume 59, page 4482. These comments deal with dependents, beneficiaries, and the Lord Campbell's Act. Lord Campbell's Act was a wrongful death statute not a survival statute. *See Gaudet* at page 579, 94 S.Ct. at page 812. Additionally, survival actions do not involve dependents and beneficiaries, as do wrongful death actions. Not only did Representative Volstead discuss the bill in terms of beneficiaries and dependents, but other representatives did likewise. *See* Mr. Sonders, page 4485, Congressional Record, 66th Congress, Volume 59.

(36) Notwithstanding this lack of reference to survival actions in the legislative history, defendants here assert that the wording of the statute directly addresses survival actions at Section 765. First, it must be emphasized the statute is devoid of any reference to the words "survival," "survival action," or "survival remedy." Section 765 reads as follows:

> If a person dies as the result of such wrongful act, neglect, or default as is mentioned in Section 761 of this title during the pendency in a court of admiralty of the United States of a suit to recover damages for personal injuries in respect of such act, neglect, or default, the personal representative of the decedent may be substituted as a party and the suit may proceed as a suit under this chapter for the recovery of the compensation provided in Section 762 of this title.

The intent of this section is to grant the beneficiaries the right to continue a decedent's original suit as a wrongful death action under DOHSA, without the burden of filing a new action. It does not state that the beneficiaries are converting the original action into a survival action. Our interpretation is based on two distinct reasons. First, the original action, which is commenced by a person who later dies, is a garden variety personal injury suit not a survival action, because the person is alive at its commencement. Second, the language substituting the beneficiaries does not convert the action into a survival action. Rather, it states, "The suit may proceed as a suit under this chapter." Referring back to Section 761, which defines the actions cognizable under this chapter, the pertinent language reads as follows:

> The personal representative of the decedent may maintain a suit for damages in the District Courts of the United States, in admiralty, for the exclusive benefit of the decedent's wife, husband, parent, child, or dependent relative against the vessel, person, or corporation which would have been liable if death had not ensued.

Thus the suit, which the beneficiaries are now undertaking, is one for their exclusive benefit. It is not a suit for the benefit of the decedent's estate, which is a survival

**1286**

action. A fortiori, a personal injury suit is converted to a wrongful death action, not a survival action. *See Bodden v. American Offshore, Inc.*, 681 F.2d 319, 331 (5th Cir. 1982).

■■■■■ (37) Aside from the legislative history and the express wording of DOHSA, the courts of appeals, which have addressed this issue, have held that DOHSA provides only a wrongful death cause of action. Accordingly, since DOHSA does not pertain to a survival action, a survival action based upon general maritime law may be joined with a DOHSA claim. DOHSA does not pre-empt a survival action, predicated upon general maritime law. *See, e.g., Barbe v. Drummond, supra* at 800; *Spiller v. Thomas, supra* at 466 F.2d 903; and *Higginbotham v. Mobil Oil Corporation*, 545 F.2d 422, 436, n. 19 (5 Cir. 1977), *reversed on other grounds*, 436 U.S. 618, 98 S.Ct. 2010, 56 L.Ed.2d 581 (1978.)

(38) Since we conclude that Congress did not address survival actions when it enacted DOHSA, the teachings of *Higginbotham* are not to the contrary. The *Higginbotham* Court emphasized, "There is a basic difference between filling a gap left by Congress' silence and rewriting rules that Congress has affirmatively and specifically enacted." Permitting the joinder of a survival action under general maritime law with a DOHSA claim not only fills a gap left by Congress but, additionally, it promotes the rationale behind the *Moragne* decision that, "Certainly, it better becomes the humane and liberal character of proceedings in admiralty to give than to withhold the remedy when not required to withhold it by established and inflexible rules."

(39) In summary, we hold that a survival action based on state law may be prosecuted with a claim under DOHSA in this Circuit, pursuant to *Dugas v. National Aircraft Corporation*, and post-*Moragne*, a survival action based on general maritime law may be coupled with a DOHSA claim for wrongful death.

### V. *Damages*

■■■ We turn now to the question of what survival action should be applied in this case. Our fidelity to the common law tradition requires this court to follow *Dugas*, despite the fact that it is pre-*Moragne* and apply the Pennsylvania Survival Act. The damages that may be recovered under that act are as follows:

A. The total amount of damages that Christine Kuntz would have earned between the date of her death and the trial. Here, plaintiff's actuary testified that decedent's gross earnings from April 14, 1978 to April 1983 totalled $47,500. We will use that testimony as a starting point, since it is uncontested. Personal maintenance, of course, must be deducted, as well as taxes.

B. The amount that Miss Kuntz would have earned from the time of trial to the end of her life expectancy. Plaintiff has presented evidence that the decedent would have worked for 38.14 years at $12,890 per year. Plaintiff has therefore computed the future wage loss at $491,625. We will use this figure as a starting point, since it has been established by a preponderance of the evidence. We must, of course, deduct personal maintenance, as well as taxes; and

C. Pain and suffering.

(40) We wish to point out that, even if our decision to follow *Dugas* and apply the Pennsylvania Survival Act is erroneous, the error is of no consequence because the same damages are recoverable in a survival action based on maritime law following the decision in *Moragne*.

(41) We find that plaintiff has established by a preponderance of the evidence that the following damages were proximately caused by the negligence of defendant, under the Pennsylvania Survival Act:

(A) The sum of $47,500 for the wage loss from the time of the accident and death; namely, April 14, 1978 to April, 1983. We have arrived at this figure by using Plaintiff's Exhibit No. 14 and the testimony of the actuary that the gross wage loss of that period is $47,500. From that, we subtracted the federal, state, and local wage taxes of $7,970. We take judicial notice of those taxes, and the following formula was used: After 1984, the federal income tax

for Miss Kuntz would have been at the rate of .108 or 11 percent; the Pennsylvania tax is 2.2 percent; the Shaler Township tax is 1 percent. We have also applied the Internal Revenue Code for this wage loss from the period of April 14, 1978 to April of 1983.

We are required to deduct these taxes pursuant to *Norfolk and Western Railroad Company v. Liepelt*, 444 U.S. 490, 100 S.Ct. 755, 62 L.Ed.2d 689 (1980). From this adjusted gross wage loss of $39,530, we have deducted the sum of $19,765 for personal maintenance, which represents 50 percent, a figure we find consistent with a young woman of decedent's age and life style. The deduction is also consistent with the evidence of record and the requirement of the very recent case in the United States Supreme Court in *Jones and Laughlin Steel Corporation v. Pfeifer*, —— U.S. ——, 103 S.Ct. 2541, 76 L.Ed.2d 768, United States Supreme Court slip opinion dated June 15, 1983. The net damages for this item are $19,765.

B. We next find that plaintiff has established by a preponderance of the evidence that plaintiff sustained damages in the sum of $491,625 for a future wage loss for 38.14 years. We are satisfied that the annual wage of $12,890 times 38.14, or $491,625, as a gross future wage loss, is a very conservative and proper approach. Plaintiff has proceeded on the assumption that future inflation will offset future wage increases and productivity, as indicated in *Kaczkowski v. Bolubasz*, 491 Pa. 561, 421 A.2d 1027 (1981). This is one method recommended by the Supreme Court in *Pfeifer*. From the gross sum we have deducted the federal, state, and Shaler Township taxes of $67,678, which we are judicially noting. The adjusted gross, after subtracting taxes, is $423,947. We then subtracted 50 percent for personal maintenance, which is consistent with Miss Kuntz's life style. This produces a net future wage loss of $211,973, which we need not reduce to present worth, because the total offset method is the best formula yet devised to measure the immeasurable. While we are not required to apply the total offset method, we agree completely with the sentiments of Judge Aldisert in *Barnes v. United States*, 678 F.2d 10 (3d Cir.1982). It is a sound approach and will be adopted as part of these findings. The net future earning loss is, therefore, $211,973.

C. Under the Survival Act, we will award to the estate the sum of $5,000 for pain and suffering.

The total net damages under the Survival Act are $236,738, which we find to have been established by a preponderance of the evidence.

(42) Under DOHSA, plaintiff sustained the following damages, which we find to have been established by a preponderance of the evidence. All other claims have been considered and rejected, especially the claim of the parents for contributions from the decedent.

We award the following damages under DOHSA:

A. Funeral expenses of Skundrich Funeral Home, $3,249.28.

B. Headstone and plot, $1,470.

C. Mortuary expense, $961, for a total of $5,680.28.

(43) The total losses sustained under DOHSA are $5,680.28. The total losses sustained under the Pennsylvania Survival Act are $236,738. As indicated, the arithmetic calculations will be filed of record as a separate finding within three days. Finally, since we have found Miss Kuntz to have been 50 percent contributorily negligent, we are required to reduce each amount by one-half. Thus, we will award to the plaintiff the total sum of $2,840.14 under DOHSA, and $118,369 under the Pennsylvania Survival Act.

(44) Windjammer has stipulated that it presented a bad faith defense concerning the issue of the agency of Tom Miller. It has agreed that counsel for plaintiff should be paid a fee of $10,000 for the time he spent in establishing the true facts, if Windjammer is held liable in this action. Since it has been held liable, we will enter judgment for plaintiff's counsel against Windjammer for $10,000 in counsel fees.

(45) We wish to note that our original jurisdiction in this case is also based on diversity of citizenship. Indeed, Windjammer removed this case on that basis. Therefore, if our reading of *Foremost Insurance Company v. Richardson* and Finding No. 10 are incorrect, and subject matter jurisdiction is lacking in admiralty, defendants are still subject to the original jurisdiction of this court, based on 28 U.S.C. § 1332, diversity of citizenship. If required, we would therefore proceed on remand from the Court of Appeals to decide this case based on state law. Under no circumstances would defendants be entitled to dismissal of the action on that basis.

(46) In a memorandum and order dated November 6, 1981, we held that plaintiff's claim against English Harbor Yachts, Ltd., was untimely under DOHSA, but timely under the Fatal Accidents Act of the Bahamas. We relied on 46 U.S.C. 764. We have carefully reviewed the legislative history since our original order. We are now convinced that our decision was erroneous, because the legislative history indicates that that section of the Act was not intended by Congress to preserve an untimely action under DOHSA. We are reminded, at this point, of the comments of Justice Frankfurter, "Wisdom ofttimes is never gained at all, and therefore should not be rejected merely because it arrives late."

We find that plaintiff's cause of action against English Harbor Yachts was not filed within two years of the accident, and therefore it is time barred. Judgment will therefore be entered for English Harbor Yachts and against the plaintiff.

### VI. *Personal Jurisdiction*

■ (47) We have previously addressed the issue of personal jurisdiction and forum non conveniens in memoranda and orders of record. Suffice to state the pretrial discovery and particularly the answers of Windjammer to plaintiff's interrogatories establish that it is subject to personal jurisdiction in this court. In the two years prior to this litigation, Windjammer advertised widely in the Philadelphia Inquirer and the Pittsburgh Post-Gazette. It also adver-

tised in many national publications. It mailed contracts to this state and to decedent. One exhibit indicates that it maintained an office in Western Pennsylvania. It is registered to do business in the State of Florida and conducts business in many states. Payment was made by decedent and 19 other persons from Pennsylvania to Windjammer, and a Windjammer film was shown in Pittsburgh as part of its advertising program. Windjammer has even been a litigant in the Court of Common Pleas of Allegheny County, Pennsylvania, and resorted to that court to settle its dispute.

■ We hold that, when a foreign corporation enters this state to solicit business and initiates a series of continuous and substantial acts to derive pecuniary benefits, the law requires that it respond to non-forum related tort activities in Pennsylvania. *Hendrickson v. Reg O Company*, 657 F.2d 9 (3d Cir.1981); *Columbia Metal Company v. Kaiser Industries*, 526 F.2d 724 (3d Cir.1975). Service of process was properly made under Rule 4(e) and 42 Pa.C.S.A. 5301, et seq.

There is no constitutional or fairness problem. *See McGee v. International Life Insurance Company*, 355 U.S. 220, 78 S.Ct. 199, 2 L.Ed.2d 223 (1957). And Windjammer is subject to personal jurisdiction under the Pennsylvania Long-Arm Statute, 42 Pa.Consolidated Statute, Section 5301(a)(2), (3) and 5322(a)(1)(i).

■ (48) The final issue of forum non conveniens requires little discussion. Plaintiff selected this forum, and Congress has specifically authorized such a decision in admiralty cases, 46 U.S.C. § 782. Thirteen witnesses testified in this case, and eight are residents of Pennsylvania; two are residents of Texas; one from Maryland, and one from Kansas. Indeed, Windjammer presented two witnesses who reside in Pennsylvania, one from Texas, and one from Kansas. The only foreign witness was an expert from the Bahamas, who appeared by deposition at the behest of English Harbor Yachts.

Federal substantive law is controlling, along with the Pennsylvania Survival Act and DOHSA. Windjammer does business in Pennsylvania, and thus there are no private or public interests which would defeat plaintiff's choice of forum. *Dahl v. Drangeld*, 632 F.2d 1027 (3d Cir.1980). In short, we find an absence of a more convenient forum.

(49) In summary, judgment will be entered for plaintiff and against defendant Windjammer "Barefoot" Cruises, Ltd., in the sum of $121,209.14. Judgment will be entered on behalf of English Harbor Yachts, Ltd., and against plaintiff because all claims are time barred. We will dismiss the claims against Fantome, Ltd., and Abagados Panamaneos Incorporados by order of court. Judgment will be entered on behalf of Balzarini, Carey and Maurizi and against defendant Windjammer "Barefoot" Cruises, Ltd., in the sum of $12,784.50 for counsel fees and expenses.

### VII. *Arithmetic Calculations as to Damages With Exhibits*

(50) In computing the value of the deceased's future earnings at trial, plaintiff produced evidence from an actuary. However, Paul Halliwell did not calculate the affect of federal, state and local income taxes. Therefore we have computed the tax on these earnings in arriving at an adjusted gross figure. For purposes of this calculation, we have utilized the following factors:

(a) The deceased's filing status is single;

(b) The deceased did not itemize deductions and thus utilized the standard deduction or zero bracket amount;

(c) The appropriate Federal Tax tables and schedules were utilized in computing the tax;

(d) The state income tax rate for all taxable years is 2.2 percent; and

(e) Christine Kuntz was a resident of Shaler Township and subject to a 1 percent local wage tax.

(51) The deceased died on April 14, 1978. Hence we computed the deceased's yearly income for the taxable years 1978 through 2021, since she would have withdrawn from the work force at that time, according to the credible evidence. Plaintiff's expert divided these years into two periods. The first is the period from April 14, 1978 to a cut-off date of April 14, 1983. The second period commences on April 14, 1983 and ends after 38.14 years of normal work expectancy, at age 63.1.

(52) In arriving at our findings, we have employed the following assumptions from the evidence and by judicial notice:

(a) There are 2080 work hours in a year thus the monthly work hours are 173.3; and

(b) The deceased's hourly wage rate was as follows:

For the period 4/14/78 through 6/30/78 $3.389 per hr.
For the period 7/1/78 through 1/31/79 $3.643 per hr.
For the period 2/1/79 through 6/30/79 $3.898 per hr.
For the period 7/1/79 through 6/30/80 $4.054 per hr.
For the period 7/1/80 through 6/30/81 $4.55 per hr.
For the period 7/1/81 through 6/30/82 $5.13 per hr.
For the period 7/1/82 and all years thereafter
$6.197 per hr.

(Schedule A, which is attached, is the actual yearly calculations.)

(53) After calculating the yearly earnings of the deceased based upon the evidence of record, we then computed the after-tax income for each year. Schedule B, which is attached, sets forth the impact of federal, state and local income taxes. We then reduced the adjusted gross figure by a personal maintenance factor of 50 percent.

EXHIBIT A

SCHEDULE A – YEARLY EARNINGS

| Year | Period | Months | Months x Hours Per Month | Total Hours | Total Hours x Hourly Rate | Total Earnings For Period |
|------|--------|--------|--------------------------|-------------|---------------------------|---------------------------|
| 1978 | 4/14/78–6/30/78 | 2½ | 2½ x 173.3 | 433 | 433 x $3.389 | $ 1467 |
| 1978 | 7/1/78–12/31/78 | 6 | 6 x 173.3 | 1040 | 1040 x $3.643 | 3789 |
| | | | | | 1978 Gross Earnings | $ 5256 |
| 1979 | 1/1/79–1/30/79 | 1 | 1 x 173.3 | 173.3 | 173.3 x $3.643 | $ 631 |
| 1979 | 2/1/79–6/30/79 | 5 | 5 x 173.3 | 867 | 867 x $3.898 | 3380 |
| 1979 | 7/1/79–12/31/79 | 6 | 6 x 173.3 | 1040 | 1040 x $4.054 | 4216 |
| | | | | | 1979 Gross Earnings | $ 8227 |
| 1980 | 1/1/80–6/30/80 | 6 | 6 x 173.3 | 1040 | 1040 x $4.054 | $ 4216 |
| 1980 | 7/1/80–12/31/80 | 6 | 6 x 173.3 | 1040 | 1040 x $4.55 | 4732 |
| | | | | | 1980 Gross Earnings | $ 8948 |
| 1981 | 1/1/81–6/30/81 | 6 | 6 x 173.3 | 1040 | 1040 x $4.55 | $ 4732 |
| 1981 | 7/1/81–12/31/81 | 6 | 6 x 173.3 | 1040 | 1040 x $5.130 | 5335 |
| | | | | | 1981 Gross Earnings | $10067 |
| 1982 | 1/1/82–6/30/82 | 6 | 6 x 173.3 | 1040 | 1040 x $5.130 | $ 5335 |
| 1982 | 7/1/82–12/31/82 | 6 | 6 x 173.3 | 1040 | 1040 x $6.197 | 6445 |
| | | | | | 1982 Gross Earnings | $11780 |

NOTE: Since the deceased's hourly wage rate remains constant after 7/1/82, according to the evidence, the gross yearly earnings for each year from 1983 through the deceased's normal work expectancy is $12,890 calculated as follows: 2080 hours per year x $6.197 hourly rate = $12,890

## EXHIBIT B

### SCHEDULE B

#### REDUCTION IN INCOME DUE TO TAXES

| 1978 | | | | 1979 | | | |
|---|---|---|---|---|---|---|---|
| TOTAL INCOME | | | $ 5,256 | TOTAL INCOME | | | $ 8,227 |
| Less: | | | | Less: | | | |
| Fed. Inc. Tax | $ 325 | | | Fed. Inc. Tax | $ 830 | | |
| State Inc. Tax | 116 | | | State Inc. Tax | 181 | | |
| Local Inc. Tax | 53 | (494) | | Local Inc. Tax | 82 | ( 1,093) | |
| AFTER TAX INCOME | | $ 4,762 | | AFTER TAX INCOME | | $ 7,134 | |

| 1980 | | | | 1981 | | | |
|---|---|---|---|---|---|---|---|
| TOTAL INCOME | | | $ 8,948 | TOTAL INCOME | | | $10,067 |
| Less: | | | | Less: | | | |
| Fed. Inc. Tax | $ 963 | | | Fed. Inc. Tax | $1,178 | | |
| State Inc. Tax | 197 | | | State Inc. Tax | 221 | | |
| Local Inc. Tax | 89 | (1,249) | | Local Inc. Tax | 101 | ( 1,500) | |
| AFTER TAX INCOME | | $ 7,699 | | AFTER TAX INCOME | | $ 8,567 | |

| 1982 | | | | 1983 | | | |
|---|---|---|---|---|---|---|---|
| TOTAL INCOME | | | $11,780 | TOTAL INCOME | | | $12,890 |
| Less: | | | | Less: | | | |
| Fed. Inc. Tax | $1,380 | | | Fed. Inc. Tax | $1,464 | | |
| State Inc. Tax | 259 | | | State Inc. Tax | 284 | | |
| Local Inc. Tax | 118 | (1,757) | | Local Inc. Tax | 129 | ( 1,877) | |
| AFTER TAX INCOME | | $10,023 | | AFTER TAX INCOME | | $11,013 | |

#### 1984 & Thereafter

| | | | |
|---|---|---|---|
| TOTAL INCOME | | | $12,890 |
| Less: | | | |
| Fed. Inc. Tax | $1,399 | | |
| State Inc. Tax | 284 | | |
| Local Inc. Tax | 129 | ( 1,812) | |
| AFTER TAX INCOME | | $11,078 | |

## EXHIBIT C

### SCHEDULE C

#### CALCULATION OF PERSONAL MAINTENANCE EXPENSE

Gross Earnings

| | |
|---|---|
| 1978 | $ 5,256 |
| 1979 | 8,227 |
| 1980 | 8,948 |
| 1981 | 10,067 |
| 1982 | 11,780 |
| 1983 and thereafter (38.39 yrs. x $12,890) * | 494,848 |
| TOTAL GROSS EARNINGS | $539,126 |

EXHIBIT C

SCHEDULE C

## CALCULATION OF PERSONAL MAINTENANCE EXPENSE

Less: Federal State and Local Taxes

| | | |
|---|---:|---:|
| 1978 | $ 494 | |
| 1979 | 1,093 | |
| 1980 | 1,249 | |
| 1981 | 1,500 | |
| 1982 | 1,757 | |
| 1983 | 1,877 | |
| 1984 and thereafter (37.35 yrs. x $1812) * | 67,678 | ( 75,648) |
| AFTER TAX EARNINGS | | $463,478 |
| x Personal and Maintenance Percentage | | .50 |
| Total Personal and Maintenance Expense | | $231,739 |

* NOTE: The 38.39 years was arrived at by subtracting from the normal work expectancy the period of time from 4/14/78 through 12/31/82 which equals 4.71 years. Thus the 38.39 years represents the time from 1/1/83 to the termination of the normal work expectancy. The $12,890 is the constant annual salary of the deceased since after 7/1/82 the hourly rate remains the same.

The 37.35 years was arrived at by subtracting from the normal work expectancy of 43.1 years the period of time from 4/14/78 through 12/31/83. This number equals 37.39 since the period from 4/14/78 through 12/3/83 equals 5.71 years. However we have reduced the number further by .04 years to reduce the tax in the final year of work since the deceased would be in a lower tax bracket than that representative of someone earning a full years salary of $12,890 upon which there is $1812 in taxes. The federal tax must be reduced since by not working an entire year the deceased would be in a lower tax bracket. In the last year of work the deceased would have worked approximately through the end of May of that year at which time the normal work expectancy would have terminated. The $1812 in taxes is a constant after 1984 since for Federal Income Tax purposes there is neither an increase or decrease in tax rates after 1983.

EXHIBIT D

SCHEDULE D

## GROSS EARNINGS REDUCED BY TAXES AND PERSONAL MAINTENANCE

| | | |
|---|---|---:|
| TOTAL GROSS EARNINGS | | $ 539,126 |
| Less: | | |
| Total Federal State and Local Taxes | | ( 75,648) |
| Total Personal and Maintenance Expense | | ( 231,739) |
| NET DAMAGES * | | $ 231,739 |

EXHIBIT D

SCHEDULE D

GROSS EARNINGS REDUCED BY TAXES AND PERSONAL MAINTENANCE

* NOTE: At findings of fact numbers 41(A) and (B) the court divided earnings into two separate amounts. The first is for the wage loss from the date of death, e.g., April 14, 1978 to April 1, 1983, the valuation date utilized by plaintiff's expert. The second is for the wage loss from the valuation date to the termination of the deceased's normal work expectancy, i.e., 38.14 years from the valuation date. The first amount, less taxes and personal maintenance, was calculated to be $19,765. The second amount, less taxes and personal maintenance, was calculated by the court to be $211,973. When these amounts are combined they equal the net damage calculation in this schedule. The following is a synopsis:

| | |
|---|---:|
| Amount stated in Finding No. 41(A) | $ 19,765 |
| Amount stated in Finding No. 41(B) | 211,973 |
| NET DAMAGES | $231,738 |

NOTE: The one dollar difference is due to rounding of the numbers.