Stacy C. GRAY, Individually, and as Surviving Spouse of Lt. Douglas G. Gray, and as Personal Representative of Lt. Douglas G. Gray, deceased

v.

LOCKHEED AERONAUTICAL SYSTEMS COMPANY, A DIVISION OF LOCKHEED CORPORATION.

Grace M. SCHUMACHER, Individually, and as Surviving Parent of Lt. John T. Hartman, and as Personal Representative of Lt. John T. Hartman, deceased

v.

LOCKHEED AERONAUTICAL SYSTEMS COMPANY, A DIVISION OF LOCKHEED CORPORATION.

Wilma J. JENNINGS, Individually, and as Surviving Parent of Lt. David S. Jennings, and as Personal Representative of Lt. David S. Jennings, deceased

v.

LOCKHEED AERONAUTICAL SYSTEMS COMPANY, A DIVISION OF LOCKHEED CORPORATION.

Civil Nos. 1:91–cv–2399–ODE, 1:91–cv–2400–ODE and 1:91–cv–2401–ODE.

United States District Court,
N.D. Georgia,
Atlanta Division.

March 31, 1995.

Edward W. Killorin, Robert Ware Killorin, Killorin & Killorin, Atlanta, GA, Howard M. Acosta, phv, Acosta & Mann, St. Petersburg, FL, for Stacy C. Gray.

Francis C. Schenck, John Russell Phillips, Greene Buckley Jones & McQueen, Edgar Adams Neely, III, Neely & Player, Atlanta, GA, for Lockheed Aeronautical Systems Co.

Amy Berne Kaminshine, Office of U.S. Atty., N.D. Ga., Atlanta, GA, Debra J. Kossow, phv-USA, U.S. Dept. of Justice, Civil Div., Torts Branch, Washington, DC, for U.S.

### ORDER

ORINDA D. EVANS, District Judge.

In these consolidated wrongful death and survival actions, Plaintiffs seek damages due to their decedents' deaths in the crash of an S–3 Viking jet aircraft ("S–3") that Defendant, a Delaware corporation, manufactured and sold to the United States Navy in 1975. Plaintiffs assert claims under the Death on the High Seas Act, 46 U.S.C. app. §§ 761–768 ("DOHSA"), and general maritime law. The court conducted a bench trial on February 21, 23, 24, 27, and 28, and March 1, 6, 7, 8, and 9, 1995. Having heard, reviewed, and considered the evidence and the arguments of the parties, the court makes the following findings of fact and conclusions of law in accordance with Fed.R.Civ.P. 52(a).

The S–3 had its genesis in a specific operational requirement ("SOR"), a document the Navy uses to identify threats and to propose weapons systems to counter those threats. The SOR relevant here addressed potentially hostile submarines and recommended the creation and acquisition of an antisubmarine warfare ("ASW") aircraft to help neutralize the threat these submarines posed. From this SOR, the Navy sought proposed designs for the new ASW aircraft from defense contractors via a request for proposal ("RFP"). Defendant and other contractors responded to the Navy's RFP with specific proposals.

The Navy selected Defendant to build the S–3 in mid–1969. A "detail specification" covering more than six hundred pages was part of the contract that Defendant and the Navy executed. However, despite its length and title, the detail specification was only the starting point for most of the S–3's components.

A naval officer, Cpt. Fred Baughman, served from July 1968 to July 1973 as the Navy's program manager for the S–3 procurement program.[1] Baughman, who worked from a Washington, D.C. office, supervised approximately 25 to 30 Navy engineers who were part of the Navy's Naval Plant Representative Office ("NAVPRO") at Defendant's Burbank, California factory, where the S–3 was designed and created. NAVPRO was Baughman's on-site representative at Defendant's factory.

NAVPRO engineers worked closely with Defendant's engineers on many aspects of the S–3's development. During the design phase the Navy conducted a series of meetings called the preliminary design review and the critical design review. Once a prototype of the S–3 existed, Baughman and a team of Navy experts conducted a functional configuration audit and physical configuration audit. Following the completion of the physical configuration audit, the Navy "froze" the S–3's design and would allow changes to the design only via a formal process under the Navy's control.

1. Baughman, now a retired rear admiral, testified at the trial for Defendant.

The Navy developed the testing regimen for the S–3. Defendant's test pilots were the first to fly the S–3. The Navy received all test results. Navy pilots then flew the S–3 in a Navy Preliminary Evaluation ("NPE"), a multi-phase test with increased complexity and demands in each succeeding phase. The Navy used the NPE to determine if the S–3 met specifications and was safe to fly. None of Defendant's employees flew with the Navy's pilots during the NPE. After the NPE, the Navy subjected the S–3 to Board of Inspection and Survey ("BIS") tests for a separate report to the Secretary of the Navy on the S–3's suitability for service use.

The S–3 ultimately passed all of the Navy's acceptance tests. Defendant delivered the particular S–3 involved in this action to the Navy in September 1975.

At the time of their deaths, Plaintiffs' decedents were stationed aboard the U.S.S. *John F. Kennedy,* an aircraft carrier. On October 7, 1989, the date the S–3 at issue crashed, the *John F. Kennedy* was conducting flight operations 125 miles off the coast of Virginia. Lt. Douglas G. Gray, the pilot of the S–3, and Lt. John T. Hartman, the mission commander, respectively sat in the left-front and right-front seats of the S–3. Air Warfare Technician Second Class ("AW2") Tracy S. Mann, the sensor operator, and Lt. (j.g.) David S. Jennings, the tactical coordinator, respectively sat in the left-rear and right-rear seats.

The S–3 was asymmetrically loaded; this means that the left wing held an 800–pound wing store, while the right wing held a 200–pound wing store. Lt. Gray and the other crewmembers properly conducted the preflight checks that are required prior to flying the S–3. The S–3 then was moved to the carrier's catapult, which is used to accelerate airplanes to flight speed.

Prior to the launch, Lt. Gray verified that the S–3's control surfaces (i.e., the ailerons, spoilers, and elevators) were working properly by executing a "control wipeout," which means that he moved the pilot's control stick laterally and longitudinally through its range of motion so that the aircrew and sailors on the deck could observe the movement of the control surfaces. He then properly config-ured the control surfaces for a catapult launch. Both engines were brought to full power and sounded normal.

When the S–3 was launched, the catapult stroke was normal. What appeared to be a momentary, orange and black fireball approximately three to four feet in diameter was observed under the S–3 as it traveled down the catapult. The S–3's engines sounded normal during the catapult stroke. The S–3 behaved normally immediately after leaving the catapult, in that it left the catapult with its wings level and began a shallow climb. Then, after approximately two seconds, Lt. Gray initiated a slow right roll. He attempted to halt this roll when the S–3 reached 20 degrees of bank angle, the normal bank angle for a clearing turn. However, the S–3 did not respond to his movement of the control stick. As the control stick moved to the left, the plane's right roll should have stopped but it did not.

When the S–3 reached 45 degrees of bank angle, AW2 Mann heard Lt. Gray exclaim "Oh my God! Eject! Eject! Eject!" The S–3 is designed with a duplicate control stick on the mission commander's side (i.e., the right side) of the cockpit; this stick is slaved to the pilot's control stick and thus mimics the movement of the pilot's control stick. At the time Lt. Gray ordered ejection, AW2 Mann observed Lt. Hartman's control stick all the way over to the left, to the point that it was touching Lt. Hartman's leg.

Upon hearing Lt. Gray's ejection command, Lt. Hartman, the designated ejector, immediately initiated the sequence that would eject all four occupants from the S–3. The two rear occupants of the S–3, Lt. Jennings and AW2 Mann, ejected first, when the S–3 was at approximately 90 degrees of right bank angle. Lt. Gray and Lt. Hartman ejected when the S–3 was at or beyond 120 degrees of right bank angle.

None of the crewmembers' parachutes had time to open before impact with the water. All three decedents struck the water with great force because of the angle of ejection and the relatively high velocity they gained from the rocket motors on the ejection seats. All three decedents suffered grievous, fatal

bodily injury upon impact with the water. Though located, Lt. Hartman's body ultimately was lost at sea due to its entanglement in debris. Though injured, AW2 Mann survived the crash.

Lt. Gray had more than 450 hours of flight experience in the S–3 at the time of his death. The S–3 at issue was in the air for approximately six to eight seconds after it left the carrier. Lt. Gray determined that the S–3 was experiencing an uncommanded right roll approximately three to four seconds into the flight. The right roll was smooth and uninterrupted until the S–3 impacted the water.

As will be discussed below, Plaintiffs contend that the S–3 crashed due to design defects in its aileron servo ("servo"). An aileron is one of the control surfaces that causes an airplane to move when it is in flight. Specifically, an aileron is "a movable part of an airplane wing or a movable airfoil external to the wing at the trailing edge for imparting a rolling motion and thus providing lateral control." *Webster's New Collegiate Dictionary* 24 (1979). On the S–3, the servo links the pilot with the ailerons.

The servo is approximately the size of a small automobile engine or transmission. It is mounted inside the S–3's fuselage and is the link between the pilot and the ailerons. A cable connects the pilot's control stick to the servo's input arm. A cylindrical "ram" made of metal is mounted horizontally inside the servo, at its very top. A rod attaches to the ram where the ram protrudes from the servo; the rod then passes through the wings and attaches to the ailerons.

The S–3 has two jet engines. When running, each engine drives a hydraulic pump, which in turn powers an independent hydraulic system. The left and right engines respectively power the number one and number two hydraulic systems. Each hydraulic system alone should provide 3000 pounds per square inch ("psi") of hydraulic pressure.

Ordinarily, the S–3's servo functions in the "powered" mode, using hydraulic power. In this mode, the pilot has no mechanical link with the ailerons. Instead, the pilot's movement of the control stick moves the input arm, which in turn moves a control valve inside the servo. The control valve causes hydraulic fluid under pressure to move the ram to the left or right; the movement of the ram causes the rod to raise or lower the ailerons. For example, when the ram moves right, the trailing edge of the right aileron rises and the trailing edge of the left aileron drops.

In the event of a hydraulic failure, the servo should automatically switch to "manual" mode, which is known as the Emergency Flight Control System ("EFCS").[2] The key to EFCS is a pin and a latch inside the servo. Adequate hydraulic pressure in the servo causes strong springs to compress, holding the pin out of the latch. When hydraulic pressure in both systems drops below 800 psi, a shutoff valve at the bottom of the servo should "trip," cutting off all hydraulic pressure in the servo. The absence of hydraulic pressure allows the springs to expand; this expansion should move the pin into the latch, an event called "latch-up." Once latch-up occurs, there is a direct mechanical link between the pilot and the ailerons, though the pilot must put much more effort into moving the control stick.

In order for the servo to return to the powered mode (i.e., in order for the shutoff valve to open), one of the hydraulic systems must achieve pressure at or above 2000 psi, plus or minus 300 psi. (Defendant's Ex. 3657 at 18.) There is a 1200 psi gap between the respective pressures for the powered and manual modes to ensure that the servo does not cycle back and forth between the two modes.

During the S–3's development, Defendant subcontracted work on the servo to Bertea Corporation ("Bertea"), which actually fabricated the servo.[3] Bertea developed the acceptance test procedure ("ATP") for the ser-

---

**2.** At the time of its design, this aspect of the servo was unique. At this time, only one other plane in the United States' inventory has a similar system.

**3.** Bertea is now a subsidiary of Parker–Hannifin Corporation ("Parker–Hannifin").

vo. An ATP tests whether a product performs in accordance with design specifications. Robert Loschke, an engineer employed by Defendant, worked on the design and development of the S–3. Appearing for Defendant, he testified that a transition lag of .25 seconds between the powered and manual modes would be hazardous. Defendant intended for the latch-up to occur in one-fourth or one-fifth of that amount of time. Nevertheless, the ATP for the servo did not measure the speed of EFCS latch-up. The ATP also was a static (as opposed to dynamic) test, in that it did not test the servo's operation while the servo was subjected to simulated flight demands (such as inputs from movement of the input arm or the ram).[4]

In the spring of 1990, the Navy recovered the servo from the crashed S–3.[5] Douglas Crawford, an engineer who worked for Defendant from 1986 to 1992, provided product support to the Navy for the S–3's flight control systems during most of his tenure with Defendant. He attended the post-crash testing of the servo and submitted a "trip report" to Defendant regarding his findings. (Plaintiffs' Ex. 220.)

The ATP's static tests showed normal operation of the servo. *Id.* at 2. However, when Crawford deviated from the ATP and moved the servo's input arm to simulate commands from the control stick, the servo's shutoff valve tripped at 1400 psi, not the specified 800 psi. *Id.* In other words, the servo's shutoff valve "sensed" 800 psi, even though the actual pressure was 1400 psi.

When the servo was disassembled after the foregoing tests, the EFCS was found to be latched-up; i.e., the pin was in the latch. Crawford, who appeared via videotaped deposition, testified that the pin could be placed in the latch by hand, though to do so required some force. Crawford observed a chip on the pin (i.e., there was a spot on the pin where the metal plating was worn away). Crawford testified, and the court finds, that

the chip showed the pin had been fluctuating in and out of the latch due to hydraulic pressure fluctuation in the servo.

When the pin and latch were measured, it was found that the latch measured .3746, while the pin measured .37487. The specification for each component requires a measurement of .3750, plus or minus .0001. Jesse Dooman, one of Plaintiffs' expert witnesses, testified, and the court finds, that the out-of-tolerance latch would adversely affect the speed of latch-up.

Defendant's own documents show that the S–3 has an ongoing, unresolved problem with its flight control system. A June 1985 document entitled "Lockheed Private Data [–] Significant In–Service Problem Report" states that

> [t]he S–3A has experienced flight control anomalies, both in flight and on the ground. Lockheed correspondence and Navy messages indicate that aircraft, at times, have had a situation where the control stick apparently has no influence on the control surfaces. Aircrews have reported that the stick feels different, somewhere between normal powered mode and Emergency Flight Control System (EFCS).

(Plaintiffs' Ex. 132 at 1; *accord* Plaintiffs' Exs. 70 and 138.) A 1987 memorandum from J.W. Schmitz, a staff engineer in Defendant's Military System Safety division, to another of Defendant's employees states that

> [a] recent report ... described an in flight lateral control system problem and highlights an urgent, repeating and an as yet unresolved safety of flight problem.

> This is the second documented lateral control system problem for this airplane since 1984. For some unknown reason the S–3 seems to be vulnerable to periodic loss of flight control effectiveness in flight.

(Plaintiffs' Ex. 167 at 1.) Lastly, the JAG Report's analysis and conclusions state that

---

**4.** In 1987, the S–3 involved in the mishap at issue here underwent a maintenance procedure known as scheduled depot level maintenance ("SDLM"). During SDLM, the servo was replaced with another servo that Bertea had rebuilt.

**5.** The S–3 was approximately 10,000 feet under the ocean's surface.

"[t]he aileron flight control servo has twelve documented [incidents] of 'free stick' in the last eight years." (Plaintiffs' Ex. 645.)

Plaintiffs produced expert testimony that the "fireball" observed under the S–3 as it traveled down the catapult probably was a large cloud of hydraulic fluid which escaped under high pressure from a rupture in one of the S–3's hydraulic systems. The court finds that the "fireball" in fact heralded the failure of one of the hydraulic systems. Crawford testified that the S–3's hydraulic systems bear the most burden during the moments after takeoff, when the systems are called on to retract the landing gear[6] and launch bar, as well as to operate the flight control surfaces. Crawford stated that pressure dropped across both hydraulic systems even with both systems working. Thus, in the two seconds before Lt. Gray initiated the right roll, one of the S–3's two hydraulic systems had failed at the time when the S–3 most needed hydraulic power. As a consequence, pressure in the S–3's remaining hydraulic system was much lower and was fluctuating because of the changing demands on the system.

Plaintiffs offered expert testimony that the components in the EFCS generated significant friction which would slow down the rate at which the servo would transition to EFCS. Plaintiffs' documentary evidence supports this testimony. In 1978, Defendant prepared a document entitled "S–3A Primary Flight Control Servo Linkage Study." (Plaintiffs' Ex. 500.) In this document, Defendant proposed placing a needle bearing around the pin in the latch mechanism in order to "[r]educe the loading and friction of the manual reversion mechanism." *Id.* at 2–3. Unsigned engineering notes dated January 13, 1986 that Defendant produced include the statement "ALEX W of BERTEA claims 5–4–84 that the 90 lb EFCS spring will not overcome 20 # friction in RAM.... Thus surface bearing friction and servo friction exceed the 20 # margin given by ALEX." (Plaintiffs' Ex. 153.) The court also notes that Defendant never conducted a kinematic study of the EFCS mechanism to determine if it generated excessive friction.

In 1984 Lyle Schaefer, Defendant's chief test pilot, verified that free stick can occur in the S–3. In an interdepartmental communication between Schaefer and J.B. Pray, another of Defendant's employees, Schaefer wrote that "[t]he 'intermediate' EFCS mode of no latch-up, no power and no control has been tagged as a shutoff valve problem. Most [of the participants at a conference hosted by the Navy] appeared to believe the condition can exist." (Defendant's Ex. 1799.)

■ Plaintiffs and Defendant agree that all of the S–3's systems were functioning properly when it was hooked to the catapult. Defendant contends that an engine failure, not a problem with the servo, caused the S–3 to crash. Specifically, Defendant contends that the right engine began suffering a "partial thrust loss" as the S–3 traveled down the catapult; i.e., something was wrong with the engine and it began producing less and less power. When the S–3 became airborne, the loss of power in the engine caused increased drag, which led the S–3 to stall and crash.

Defendant's stall theory is plausible. However, the evidence does not support it. First, there was undisputed testimony at trial that Defendant adopted its stall theory only after discovery had ended and shortly before trial was to begin.

Second, the Navy prepared a Judge Advocate General's Report ("JAG Report") regarding the crash. The Navy rejected engine failure as a cause of the S–3's crash in the JAG Report's analysis and conclusions. (Plaintiffs' Ex. 645.) Moreover, the court has found above that the S–3 flew normally during the first two seconds of flight. This initial period of normal flight is inconsistent with the loss of power in one engine.

Third, witnesses testified, and the court finds, that the S–3 could fly off the deck of an aircraft carrier with only one engine. Defendant's theory requires the court to find that either Lt. Gray failed to notice a right-engine failure or he noticed an engine failure but

---

**6.** The JAG Report's findings of fact state that the S–3's gear was down when it crashed. (Plaintiffs' Ex. 651, ¶ 42.) However, none of the witness statements cited in the findings of fact support this statement. *See* witness statements cited in Plaintiffs' Ex. 651, ¶ 42.

failed to take the necessary steps to compensate for the loss of power. However, Defendant produced no evidence to support such a finding. By all accounts, Lt. Gray was a competent, experienced pilot. Defendant produced no evidence to challenge his abilities. Instead, it relied on an autopsy finding that showed he was self-medicating with cold medicine at the time of the crash despite a general prohibition on self-medication in the naval aviation community. While the amount of cold medicine in Lt. Gray's system was higher than the recommended therapeutic dosage, Defendant provided no evidence by which the court can assess whether this overage had any significance. Moreover, the Navy placed little credence in Lt. Gray's self-medication as a cause of the crash in the JAG Report's analysis and conclusions. *See id.* at 3–4.

Based on the foregoing discussion, the court declines to find that the S–3 stalled and crashed due to a loss of power in its right engine. On the other hand, the abundant evidence discussed earlier shows that the following sequence of events more probably than not led to the crash of the S–3: All systems on the S–3 were working properly when it was hooked to the catapult. However, as the S–3 traveled down the catapult, one of its hydraulic systems suffered a complete failure. Contrary to expectations, pressure in the remaining hydraulic system dropped because of the added demands for hydraulic power it had to satisfy with the loss of the other system. Lt. Gray's initiation of the right roll, which necessarily moved the servo's input arm, caused the servo to attempt to transition into EFCS at 1400 psi. However, the low, fluctuating hydraulic pressure, coupled with the shutoff valve's operation at a higher-than-specified pressure, caused the servo to chatter at millisecond intervals between the powered and manual modes. The friction in the EFCS mechanism and a mis-sized latch impeded the servo's ability to transition swiftly into EFCS. The chattering caused (1) the freezing of the ram in the right roll position (with an attendant freezing of the aileron in the same position) and (2) the condition known as "free stick," in which Lt. Gray's movement of the control stick did not translate into any move-

ment of the control surfaces. The S–3 thus continued the smooth right roll noted above until impact with the ocean.

## GOVERNMENT CONTRACTOR DEFENSE

Because Plaintiffs assert that several design defects caused the servo to chatter, the court must first determine whether Defendant is immune from liability for these alleged defects under the "government contractor defense." The Supreme Court adopted this defense as federal common law in *Boyle v. United Technologies Corp.,* 487 U.S. 500, 108 S.Ct. 2510, 101 L.Ed.2d 442 (1988). Under this defense, a government contractor is not liable for injuries caused by a product's defective design if the following elements exist:

> (1) the United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States.

*Id.* at 512, 108 S.Ct. at 2518. The court finds that Defendant failed to show the existence of the first and second of the foregoing elements.

██ Defendant produced extensive evidence that there was a close working relationship between it and the Navy during the overall design and creation of the S–3. However, a close working relationship is not enough to satisfy the first *Boyle* prong. "*Boyle* makes clear that the requirements of 'reasonably precise specifications' and conformity with them refer to the *particular feature* of the product claimed to be defective." *Bailey v. McDonnell Douglas Corp.,* 989 F.2d 794, 799 (5th Cir.1993) (citing *Boyle,* 487 U.S. at 512, 108 S.Ct. at 2518) (emphasis in original).

As noted above, Defendant subcontracted work on the servo to Bertea. William Burriss, a civilian Navy engineer, was deeply involved in the S–3 procurement program. Appearing at trial as Defendant's witness, he testified that typically a prime contractor would have a large amount of control over a

subcontractor's work on a component, with little Navy involvement. The development of the servo followed this pattern. Defendant produced no evidence that the Navy ever reviewed and approved specific engineering drawings of the servo. *Cf. Maguire v. Hughes Aircraft Corp.*, 912 F.2d 67, 71 (3d Cir.1990) ("The Air Force's senior project engineer reviewed and approved every element of the proposed design and every proposed design change."); *Kleemann v. McDonnell Douglas Corp.*, 890 F.2d 698, 702 (4th Cir.1989) ("[T]he Navy here performed extensive review of detailed design drawings submitted by MDC."), *cert. denied*, 495 U.S. 953, 110 S.Ct. 2219, 109 L.Ed.2d 545 (1990). Instead, Defendant relied on a document entitled "Equipment Specification—Power Servos, Primary Flight Controls" as proof that the first *Boyle* prong was satisfied. (Defendant's Ex. 3657.) However, the Equipment Specification was prepared in 1968, prior to the execution of the contract between Defendant and the Navy and long before a working servo existed. Moreover, a review of the Equipment Specification reveals that it contains only narrative descriptions of the various aspects of the servo; these descriptions are no more detailed than the findings of fact in this order. *See id. passim.* The court finds that these descriptions do not qualify as "reasonably precise specifications." Finally, Defendant relies on the various reviews and audits, as well as the NPE and BIS tests, of the S–3 to show the Navy's approval of the servo. However, Defendant produced no evidence that the Navy reviewed and approved specific engineering drawings of the servo during any of these events. Therefore, the Navy's overall acceptance of the S–3 following the various reviews, audits, and tests was, with regard to the servo, merely a "rubber stamp" approval that did not satisfy the first *Boyle* prong. *Trevino v. General Dynamics Corp.*, 865 F.2d 1474, 1480 (5th Cir.), *cert. denied*, 493 U.S. 935, 110 S.Ct. 327, 107 L.Ed.2d 317 (1989). Defendant thus failed to satisfy the first *Boyle* prong.

■ Assuming that the Navy had approved reasonably precise specifications for the servo, it is clear that the servo did not conform to those specifications. This is because the narrative specifications introduced into evidence clearly called for an automatic manual reversion system that operated without a hazardous lag. The servo failed both of these requirements. First, the foregoing discussion of chatter in the servo abundantly demonstrates that it suffered from a hazardous lag. Second, Plaintiffs produced expert testimony (including testimony by Crawford) that the transition to EFCS could not occur because Lt. Gray held the S–3's control stick as far to the left as it would go. It is undisputed that the ram must be within 60% of its centered position for latch-up to occur; Plaintiffs' experts thus testified that the control stick had to be moved to within 60% of its centered position to allow corresponding movement by the ram. Defendant's expert witness disagreed, contending that, once a hydraulic failure occurred and the servo lost hydraulic pressure, aerodynamic forces (i.e., the pressure of wind moving over the wings) would force the ailerons down, which in turn would move the ram to the centered position. However, Defendant's expert witness did not address the situation that existed here, where the servo was subjected to a diminished, fluctuating hydraulic power source, not a total loss of hydraulic power. Moreover, Mark McWhorter, one of Defendant's engineer employees, co-authored a memorandum with Heather Shoup, a civilian Navy engineer, in May 1992; the memo expressly states that "[t]he requirement for the stick being within the 60% authority range is only applicable when transferring into EFCS from powered flight. If the stick is outside of this range the servo may not latch, resulting in a loss of feel or a free stick." (Plaintiffs' Ex. 619.) The preponderance of the evidence favors Plaintiffs' assertion that the control stick had to be within 60% of its centered position for latch-up to occur. Thus, the EFCS was not automatic, since under some circumstances the pilot had to take some affirmative action to engage it.

### LIABILITY

At the time they were filed, Plaintiffs' complaints contained the following identical counts against Defendant:

1–3: negligence in the design of the aircraft, the manufacture and construction of

the aircraft, and the failure to warn about the danger of the aircraft;

4–6: gross negligence in the design of the aircraft, the manufacture and construction of the aircraft, and the failure to warn about the danger of the aircraft;

7–9: wanton and willful conduct in the design of the aircraft, the manufacture and construction of the aircraft, and the failure to warn about the danger of the aircraft;

10–12: strict liability in tort, breach of the warranty of fitness for a particular purpose, breach of the warranty of being reasonably suited to the use intended, and breach of the warranty of merchantability as to the design of the aircraft, the manufacture and construction of the aircraft, and the failure to warn about the danger of the aircraft;

13–15: breach of the warranty of seaworthiness as to the design of the aircraft, the manufacture and construction of the aircraft, and the failure to warn about the aircraft;

16–17: intentional torts of assault and battery because of intentional improper design and intentional improper manufacture and construction;

18–20: intentional infliction of emotional distress because of faulty design, faulty manufacture and construction, and failure to warn about the dangers of the aircraft.

In its June 17, 1992 order, the court in part granted Defendant's motion for partial judgment on the pleadings. The court found that Plaintiffs had no cause of action under Georgia's wrongful death statute, the Public Vessels Act, and the Suits in Admiralty Act. As for the specific counts in Plaintiffs' complaints, the court found that Plaintiffs had no cause of action for a breach of warranty of seaworthiness or for assault and battery. The court also granted judgment to Defendant to the extent that Plaintiffs were suing in their individual/survivor capacities. Thus, at this point, Plaintiffs appear in these actions only as the personal representatives of their decedents' estates.

In its September 30, 1994 order denying Defendant's motion for summary judgment, the court noted that Plaintiffs had abandoned all of their state law claims. Thus, at this point, the legal basis for Plaintiffs' claims is DOHSA and general maritime law. In their pretrial brief, Plaintiffs discuss only their strict liability and negligence claims. The court therefore dismisses the remaining, undiscussed claims as abandoned.

■ "Strict liability ... is available in actions brought under the [DOHSA]." *Pavlides v. Galveston Yacht Basin, Inc.,* 727 F.2d 330, 338 (5th Cir.1984). The court relies on generally-accepted principles of tort law for the elements of this claim:

(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if

(a) the seller is engaged in the business of selling such a product, and

(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

(2) The rule stated in Subsection (1) applies although

(a) the seller has exercised all possible care in the preparation and sale of his product, and

(b) the user or consumer has not bought the product from or entered into any contractual relation with the seller.

*Restatement (Second) of Torts,* § 402A (1963–64).

■ Based on the foregoing discussion, the court finds that the S–3 at issue was in a defective condition, since under certain circumstances the servo would chatter between the powered and manual modes. The catastrophic effect of the free stick condition Lt. Gray consequently faced shows that the defective condition was unreasonably dangerous. Finally, the court finds that the conditions specified in § 402A(1)(a) and (b) existed at the time of the S–3's crash.[7] Therefore,

---

7. The servo's replacement in 1987 and the manufacturing defect in the latch of the replacement

servo have no bearing on Defendant's liability for the *design* defects discussed above.

Defendant is liable to Plaintiffs on their strict liability claims.

█ The generally-accepted standard for negligence is conduct that falls below what a reasonable person would have done under like circumstances. *Restatement (Second) of Torts,* §§ 282–283 (1963–64). The circumstances present here were Defendant's creation of a unique, and therefore untested, flight control component for a Navy warplane. The court finds that Defendant was plainly negligent in the following omissions:

First, Defendant's own expert witness testified that a .25 second transition lag between the powered and manual modes was hazardous. The lives of an S–3's crew literally hang in the balance when EFCS transition occurs. Nevertheless, the ATP (for which Defendant was responsible) made no provision for testing the speed of latch-up. Moreover, testing the speed of latch-up likely would have revealed the fact that the latch was undersized.

Second, an ATP that simulated flight demands on the servo would have allowed Defendant to discover the friction the EFCS mechanism generated, the tripping of the shutoff valve at higher-than-specified pressures, the fact that the latch was undersized, and the fact that the control stick had to be within 60% of its centered position for latch-up to occur.

## DAMAGES

Two types of damages are at issue in these cases: "survival" damages and "wrongful death" damages. "[A] survival action compensates the decedent's estate for damages incurred by him personally while wrongful death recovery compensates the decedent's dependents and other survivors for the damages they incurred due to the death." *Law v. Sea Drilling Corp.,* 523 F.2d 793, 795 (5th Cir.1975).[8]

Under DOHSA, a decedent's personal representative may sue for damages "for the

exclusive benefit of the decedent's wife, husband, parent, child, or dependent relative." 46 U.S.C. app. § 761. DOHSA sets allowable damages as "a fair and just compensation for the pecuniary loss sustained by the persons for whose benefit the suit is brought." 46 U.S.C. app. § 762. Because of this pecuniary limitation, some courts in the past allowed plaintiffs to supplement DOHSA claims with wrongful death and survival claims under general maritime law. A general maritime law wrongful death claim allowed a plaintiff to seek loss of society damages, while a general maritime law survival claim allowed the award of damages for the decedent's pain and suffering and lost future income (without reference to the loss of the decedent's survivors), as well as punitive damages. *E.g., Law v. Sea Drilling Corp.,* 510 F.2d 242, 250, *reh'g denied,* 523 F.2d 793 (5th Cir.1975) (loss of society damages on general maritime law wrongful death claim).

█ In *Mobil Oil Corp. v. Higginbotham,* 436 U.S. 618, 98 S.Ct. 2010, 56 L.Ed.2d 581 (1978), the Supreme Court addressed an action that arose from an accident on the high seas (like the instant accident), not territorial waters. The Court rejected the piggy-backing of general maritime law wrongful death claims on DOHSA claims by holding that DOHSA was the sole remedy for accidents on the high seas. *Higginbotham,* 436 U.S. at 623–24, 98 S.Ct. at 2014. The Court thus rejected loss of society damages for accidents occurring on the high seas. *Id.* The issue that remains is whether, after *Higginbotham,* Plaintiffs have viable survival claims under general maritime law.

In the second *Law* opinion, the Fifth Circuit endorsed a general maritime law survival action. *Id.,* 523 F.2d at 795. The Fifth Circuit has answered the question whether such a survival action survived the Supreme Court's *Higginbotham* decision:

> The Supreme Court granted certiorari to decide whether in addition to the damages

---

8. In *Bonner v. City of Prichard,* 661 F.2d 1206, 1207 (11th Cir.1981), the Eleventh Circuit adopted as binding precedent decisions of the

former Fifth Circuit handed down prior to October 1, 1981.

explicitly authorized by DOHSA, the *Moragne* wrongful death remedy could by ·used in a DOHSA suit to recover non-pecuniary damages. The Court held that DOHSA was intended to be the exclusive *wrongful death* remedy in its area of coverage, and therefore the *Moragne* action could not be coupled with a DOHSA action to recover [non-pecuniary] damages for wrongful death.... The limited nature of this holding must be emphasized. Like DOHSA itself, *Higginbotham* treats solely wrongful death and wrongful death damages; it does not address survival actions. Given this, *Higginbotham* cannot be read as authority for the proposition that DOHSA precludes a survival action in the case of deaths occurring on the high seas.

*Azzopardi v. Ocean Drilling & Exploration Co.*, 742 F.2d 890, 894 (5th Cir.1984) (citations omitted) (emphasis in original). Given *Azzopardi's* persuasive reasoning, the court finds that Plaintiffs have viable survival claims under general maritime law. However, the court also finds that Plaintiffs may recover only pain and suffering damages on these claims. The Supreme Court's opinion in *Miles v. Apex Marine Corp.*, 498 U.S. 19, 36, 111 S.Ct. 317, 327–28, 112 L.Ed.2d 275 (1990), mandates this limitation.

In *Miles*, the Supreme Court rejected a plaintiff's bid for damages for her decedent's lost future income pursuant to a survival claim under general maritime law:

We sail in occupied waters. Maritime tort law is now dominated by federal statute, and we are not free to expand remedies at will simply because it might work to· the benefit of seamen and those dependent upon them. Congress has placed limits on recovery in survival actions that we cannot exceed. Because this case involves the death of a seaman, we must look to the Jones Act.

The Jones Act/[Federal Employers' Liability Act ("FELA")] survival provision limits recovery to losses suffered during the decedent's lifetime.... Because Torregano's estate cannot recover for his lost future income under the Jones Act, it cannot do so under general maritime law.

*Miles,* 498 U.S. at 36, 111 S.Ct. at 327–28. Thus, in *Miles* the Supreme Court expressly held that the damages available on· a general maritime law survival claim must be governed by the damages available under the Jones Act and FELA. Punitive damages are not available on a survival claim under the Jones Act or FELA. *Wildman v. Burlington N. R.R. Co.*, 825 F.2d 1392, 1395 (9th Cir.1987) (FELA); *Kopczynski v. The Jacqueline*, 742 F.2d 555, 560–61 (9th Cir.1984), cert. denied, 471 U.S. 1136, 105 S.Ct. 2677, 86 L.Ed.2d 696 (1985) (Jones Act); *Kozar v. Chesapeake & Ohio R. Co.*, 449 F.2d 1238, 1240–43 (6th Cir.1971) (FELA).

■ In summary, the court finds that DOHSA is the exclusive basis for Plaintiffs' wrongful death claims. Thus, Plaintiffs may recover wrongful death damages for loss of support, loss of services, and funeral expenses, but no damages for loss of society.[9] The court further finds that Plaintiffs have viable survival claims under general maritime law. Plaintiffs may recover damages for pain and suffering on these claims, but not punitive damages or damages for lost future income. The damages for pain and suffering awarded on these claims must go to Plaintiffs' decedents' respective estates. *Law,* 523 F.2d at 795.

■ Lt. Gray was 29.84 years old at the time of his death. His annual salary was $30,466.80 exclusive of fringe benefits. (*See* Plaintiffs' Ex. 457.) His fringe benefits included comprehensive medical care, retirement benefits, access to base exchanges and commissaries, and use of a world-wide network of clubs and recreational facilities. His life expectancy was 42.94 years, while his work life expectancy was 32.44 years. Lt. Gray was survived by his wife, Plaintiff Stacy

9. Given § 762's language, wrongful death damages are measured from the survivor's point of view, not the decedent's.

C. Gray. Mrs. Gray was thirty-one years old at the time of trial.

 Lt. Hartman was 31.4 years old at the time of his death. His annual salary and fringe benefits were approximately the same as Lt. Gray's. His life expectancy was 41.48 years, while his work life expectancy was 30.97 years. Lt. Hartman was survived by his wife, Debra Kelly Hartman Elliot,[10] his mother, Plaintiff Grace M. Schumacher, his father, Donald Schumacher, and several siblings. At the time of trial, Mrs. Elliot was twenty-nine years old and Mrs. Schumacher was seventy-five years old.

 Lt. Jennings was 28.3 years old at the time of his death. His annual salary was $20,210.40 exclusive of fringe benefits. (*See* Plaintiffs' Ex. 459.) His fringe benefits were the same as the other two decedents'. His life expectancy was 44.3 years, while his work life expectancy was 33.74 years. Lt. Jennings was survived by his mother, Plaintiff Wilma J. Jennings, his father, Frank Jennings, and a brother. At the time of trial, Mrs. Jennings was fifty-seven years old.

On the wrongful death claims, Mrs. Gray claims damages only for herself; Mrs. Schumacher claims damages for herself and for Mrs. Elliot; and Mrs. Jennings claims damages only for herself. On the survival claims, Plaintiffs seek damages on behalf of their decedents' respective estates; letters testamentary were placed into evidence for each of the named Plaintiffs. (Plaintiffs' Exs. 457–459.)

 In determining the damages Plaintiffs are entitled to for the loss of their decedents' support, the court has calculated each decedent's lifetime earnings. Contrary to Plaintiffs' position at trial, the court finds that gross earnings must be reduced by income taxes. *Norfolk & Western R. Co. v. Liepelt,* 444 U.S. 490, 493, 100 S.Ct. 755, 757, 62 L.Ed.2d 689 (1980) ("It is [the wage earner's] after-tax income, rather than his gross income before taxes, that provides the only realistic measure of his ability to support his family."). The court accordingly has deducted twenty percent of each decedent's gross lifetime earnings to account for income taxes. The court also has reduced gross lifetime earnings to account for each decedent's personal consumption, and has discounted each decedent's net lifetime earnings to present value. The sums awarded represent the actual pecuniary loss of the respective Plaintiffs.

Based on the foregoing calculations, the court awards loss of support damages to Mrs. Gray in the amount of $1.5 million, and to Mrs. Schumacher (including the claim on behalf of Mrs. Elliot) in the amount of $1.2 million. Regarding Mrs. Jennings, the court takes special note of her testimony that Lt. Jennings each year gave her several thousand dollars, as well as the fact that after his death she sought and received welfare benefits (from 1991 to 1993). From these facts, the court finds that Lt. Jennings' support to his mother would have been more extensive than is ordinarily the case. The court thus awards Mrs. Jennings loss of support damages in the amount of $600,000.00.

Having considered the testimony of the Plaintiffs and Mrs. Elliot, as well as the arguments of the parties, the court awards loss of services damages to Mrs. Gray in the amount of $300,000.00, to Mrs. Schumacher (including the claim on behalf of Mrs. Elliot) in the amount of $300,000.00, and to Mrs. Jennings in the amount of $175,000.00. These sums represent present cash value and are the actual pecuniary losses of each Plaintiff. The court awards no funeral expenses because Plaintiffs produced no evidence on this element of damages.

On the issue of pain and suffering, the court finds that each decedent likely experienced a few seconds of mental anguish prior to his death. Therefore, the court awards

---

10. At trial, Mrs. Elliot testified that she had remarried. This fact is irrelevant to the court's calculation of damages. *Brown v. United States,* 615 F.Supp. 391, 397–98 (D.C.Mass.1985), *dis-* *missed,* 795 F.2d 76 (1st Cir.1986), *cert. denied,* 479 U.S. 1058, 107 S.Ct. 938, 93 L.Ed.2d 989 (1987); *Blumenthal v. United States,* 189 F.Supp.

each Plaintiff $50,000.00 as the personal representative of her decedent's estate.

In summary, the court finds Defendant liable for damages as follows:

| | Loss of Support | Loss of Services | Pain and Suffering[11] |
| --- | --- | --- | --- |
| Gray | $1.5 mil. | $300,000 | $50,000 |
| Schumacher | $1.2 mil. | $300,000 | $50,000 |
| Jennings | $600,000 | $175,000 | $50,000 |

### CONCLUSION

Accordingly, all claims remaining in Plaintiffs' complaints are DISMISSED with prejudice with the exception of the wrongful death and survival claims for negligence and strict liability under DOHSA and general maritime law. Plaintiffs shall have judgment against Defendant on these remaining claims. Plaintiff Stacy C. Gray is AWARDED $1.8 million for her own damages and $50,000.00 as the personal representative of the estate of Lt. Douglas G. Gray. Plaintiff Grace M. Schumacher is AWARDED $1.5 million for her own damages and the damages of Debra Kelly Hartman Elliot, and $50,000.00 as the personal representative of the estate of Lt. John T. Hartman. Plaintiff Wilma J. Jennings is AWARDED $775,000.00 for her own damages and $50,000.00 as the personal representative of the estate of Lt. (j.g.) David S. Jennings. The Clerk is DIRECTED to enter judgment for Plaintiffs in accordance with the terms of this order.

SO ORDERED.

439, 449 (E.D.Pa.1960), *aff'd,* 306 F.2d 16 (3d Cir.1962).

11. As noted above, these damages must be distributed through the decedents' respective estates.